IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:21-CR-00225 |
| | ) | |
| MOHAMMED TARIQ, | ) | |
| Defendant. | ) | |
| _____ | ) | |

## POSITION ON SENTENCING

Mr. Tariq submits that a sentence of 12 months and 1 day followed by a term of supervised release serves the goals of sentencing. Here is why:

*First*, Mohammed Tariq's childhood in a region marred by armed conflict and the poverty that drove him to work at age twelve, support a variant sentence.

*Second*, because of his status as recent refugee, Mohammed Tariq suffered uniquely harsh conditions of pre-trial confinement. This is a punishment not accounted for or contemplated in the guidelines.

*Third*, any sentence this Court imposes will likely be followed by a lengthy period of administrative detention as the United States will not return Mr. Tariq to Afghanistan, and further restrictions on Mohammed Tariq's liberty (should he be allowed to remain in the United States) including the requirement that he register as a sex offender.

I.      *Mr. Tariq's childhood, marked by war and poverty, support a variant sentence in this case.*

Mohammed Tariq is in his mid-twenties, though he cannot say with certainty his exact age. He does not know the month of his birth and is uncertain of the year. The eldest of eight children, Mohammed's parents hail from Paktika Province, in Eastern Afghanistan. Afghanistan has been engulfed in conflict for decades and is considered by many to be "the site of some of the most monumental humanitarian crises of the last half-century.[1] Like many other Afghans in the mid to late nineties, Mohammed's family fled their home because of fighting and poverty. Born in a refugee camp, Mohammed believes he spent the first six or seven years of his life in this camp in Pakistan. Mohammed has few distinct memories of the refugee camp, but when asked to describe it, he is brought to tears.  By the time Mohammed reached seven or eight years of age the family returned to Afghanistan. They moved to a small farming village where his nuclear family lived a five bedroom house along with twenty to thirty members of their extended family.

As the eldest child (and son) Mohammed has always felt a strong duty to provide for his family. This burden only increased after his father suffered an accident that left him with permanent injuries. Mohammed's father worked with "foreigners." One day, while at work his father's vehicle drove over a mine that exploded. Treated

---

[1] *See*, Kronenfel A. David, *Afghan Refugees in Pakistan: Not All Refugees, Not Always in Pakistan, Not Necessarily Afghan?* Journal of Refugee Studies Vol. 21, No. 1 at 47, Oxford University Press (2008).

by foreign doctors, his father survived but was left with permanent leg injuries that hindered his ability to make a living.

Growing up, Mohammed and his family had food to eat and a roof over their heads but always struggled to make ends meet. His father's accident and the family's continued economic struggles, compelled Mohammed to enter the work force at age twelve. As a result, Mohammed only completed five years of schooling. He cannot read or write in any language, or even spell his name.

Not yet a teenager, and with little education, the employment opportunities for Mohammed were slim.  He did the only thing he could, he began working for the Afghan army to help support his family. From age twelve to fifteen Mohammed worked for the Afghan army. At fifteen Mohammed began working alongside the U.S. military in the fight against the Taliban.

Only twelve, the thought of fighting terrified Mohammed, but he had to work, and this was his only choice.  Mohammed suffered during his years of work in armed conflict. He lost his best friend in front of his own eyes. He saw bodies of civilians and fellow fighters. Given a gun by the age of fifteen, regrettably he had to use it. The conflict left Mohammed in a state of fear and anxiety. Traumatized by the close friends he had lost, and fearful of losing others, to date Mohammed has nightmares.

As he was just a boy when he began working in armed conflict, Mohammed's memories are vague and unformed, but it is abundantly clear that he witnessed indescribable atrocities. This is not surprising. During the years Mohammed worked for the Afghan army, and later the Americans, the Paktika province was riddled with

violence. Bombings and attacks on civilians were not uncommon[2] and there was heavy fighting between U.S. Forces and the Taliban.[3]

It is impossible to understand the impact this early and prolonged exposure to armed conflict had on Mohammed. He has never received any treatment or evaluation of any kind. However, studies have shown that chronic stress like poverty, or abuse (and assuredly armed conflict)  can have long "lasting negative impacts."[4] Indeed, researchers believe that early life stressors "might be changing the parts of developing children's brains responsible for learning, memory and the processing of

---

[2] *See*, Afghan market car bomb kills 42 in Paktika province, BBC News (July 2014), available at: Afghan market car bomb kills 42 in Paktika province - BBC News (last checked Apr. 19, 2022)( "For the Afghan civilians, Tuesday's attack once again brings to light how daily life is fraught with many dangers in Afghanistan."); U.S. Embassy Condemns Attack in Paktika Province, U.S. Embassy Press Release, ( Sept. 2015) available at: U.S. Embassy Condemns Attack in Paktika Province - U.S. Embassy in Afghanistan (usembassy.gov) (last checked Apr. 19, 2022) (condemning an attack on a crowd of civilians playing a sport); Londono *et al*, *Taliban claims responsibility for deadly bombing in eastern Afghanistan*, Washington Post (Mar. 2011) available at: Taliban claims responsibility for deadly bombing in eastern Afghanistan - The Washington Post (last checked on Apr. 19, 2022)(explaining a Taliban suicide bomber killed at least 24 people).

[3] *See*, *Two districts in southeastern Afghanistan fall to Taliban*, Reuters (July 24, 2018) available at: Two districts in southeastern Afghanistan fall to Taliban | Reuters (last checked Apr. 19, 2022)(explaining Taliban fighters attacked checkpoints and took over districts in the province.);*U.S.-led Troops Kill 55 Taliban after Afghan ambush*, Reuters, (June, 2008), available at: U.S.-led troops kill 55 Taliban after Afghan ambush | Reuters (last checked Apr. 19, 2022) (detailing a fight between Taliban and US forces in the Paktika district and noting a "sharp rise in violence along Afghanistan's Eastern Frontier[.]")

[4] University of Wisconsin-Madison, *Early Life Stress Can Leave Lasting Impacts on the Brain*, Science Daily (June 27, 2014), available at Early life stress can leave lasting impacts on the brain -- ScienceDaily (last checked Apr. 19, 2022)

stress and emotion."[5] Suffice it to say, Mohammed did not enjoy a "normal" childhood by any standard.

II.     *The uniquely punishing conditions of Mr. Tariq's pretrial confinement further support a sentence below the recommended guidelines.*

Mohammed became a participant in armed conflict as a child, hoping to earn enough money to invest in a small shop to support his family. More than a decade later, when Afghanistan fell to the Taliban, Mohammed found himself with an unimaginable decision—should he flee? When the U.S. pulled troops out of Afghanistan and the Taliban seized control, Mohammed was given the opportunity to come to the U.S. He did not want to his leave his family, but his mother reassured him he would finally "have a happy life" in the U.S. His plan—like the many millions who seek refuge in this country—was to find a job, send money home to his family, and someday reunite with them either here or Afghanistan. Mohammed is engaged to be married through an arranged marriage, and though he does not know his fiancée very well, he was excited to be wed.

Mohammed came to the U.S. with his unit from the Paktika province, that included a cousin and uncle. Their flight from the Taliban took them to Qatar, then Germany and finally Camp Upshur in Virginia. Mohammed arrived at Camp Upshur on September 7, 2021; he was arrested about two weeks later. Dkt. No. 56 at 6. Mohammed who speaks no English, landed in the United States after a whirlwind journey. Grappling with the life altering decision he made to flee and the incredible

---

[5] *Id.*

distance from his family, Mohammed had little time to acclimate to his new surroundings. He relied heavily on his fellow unit members support and the contact he was able to maintain with his family in Afghanistan. While at the Camp, Mohammed was also able to have short conversations and send messages to his family in Afghanistan. These contacts to home kept his spirits up, they were his lifeline.

Since his arrest on September 23, 2021, Mohammed has remained under custody at Pamunkey Regional Jail, outside of Richmond, Virginia. No one at the jail speaks Mohammed's language. Most days, and unless he has a legal call or video, Mohammed is unable to communicate with the people surrounding him. He has had trouble accessing the services that the jail does offer. And, since his incarceration Mohammed has lost his ability to communicate with his family members in Afghanistan. His connection to his family and his community have been completely severed. In every meeting with counsel, Mohammed expresses anguish over his family. When will he see them again? Are they safe? How will they survive without his financial support? Mohammed knows that his mother has heard about his arrest and is distraught, but he cannot talk to her and reassure that at the very least, he is in good health. Knowing that his mother is upset when he cannot comfort her causes Mohammed great pain.

Mohammed's pretrial confinement has come with a deep sense of isolation and sorrow because of his unique circumstances. Only in the U.S. for weeks, Mohammed comes from a community and culture incomparable to this country. Growing up if

conflict arose, the issue was brought to village elders, who doled out punishments and delineated right from wrong. With little education and cultural knowledge, Mohammed was ill equipped to comprehend the American legal system and what was happening to him. And he had to face this case alone, completely isolated, a harrowing experience for a young man who was raised among a large extended family.

The conditions of Mohammed's pre-trial confinement have been uniquely harsh and should, the defense submits, be considered in the Court's sentencing determination. In the compassionate release context, courts have recognized that the punitive nature of incarceration due COVID-19 restrictions is a factor courts can consider in granting compassionate release. *See, e.g.*, *United States v. Newell*, 1:13-CR-165-1, 2021 WL 3269650, at *6-7 (M.D.N.C. July 30, 2021) (granting compassionate release in part because defendant's "increased isolation from the outside world, his particular mental health issues . . . undoubtedly increase[d] his prison sentence's punitive effect" (internal quotation marks and citations omitted)); *United States v. Pina*, No. 18-CR-179 (JSR), 2020 WL 3545514, at *2 (S.D.N.Y. June 29, 2020) (finding extraordinary and compelling reasons where "confinement to his cell for 22 hours a day" exacerbated defendant's depression and anxiety). The same rationale applies here: That is, the uniquely punitive nature of Mohammed's pre-trial detention is a factor the Court can consider and supports a variant sentence in this case.

III.    *Legal Standard and Guidelines.*

A jury convicted Mohammed of a single count of abusive sexual contact in violation of 18 § U.S.C. 2244(a)(5). Having presided over the trial, the Court is familiar with the relatively simple facts of this case. Mohammed was living at a refugee camp in Virginia when U.S. Marines reported that he inappropriately touched a girl over her clothes. The brief interaction took place in public. There was no allegation whatsoever that Mohammed had prior contact with the girl or with any other child.  The defense has reviewed the presentence report and offers no objection to the guideline range.

However, this Court has broad discretion to impose a sentence in line with the factors enumerated in Section 3553(a).[6] *See United States v. Booker* 543 U.S. 220, 259-60 (2005); *see also Kimbrough v. United States*, 552 U.S. 85 (2007) (Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. § 3553(a)); *Gall v. United States*, 552 U.S. 38 (2007) (same).  The primary directive in the actual language of §3553(a) is to "impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes" of sentencing.  (Emphasis added).  After *Booker*, *Kimbrough,* and *Gall*, therefore,

---

[6] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

sentencing courts must impose the minimum sentence that is sufficient to accomplish the objectives of § 3553(a).  *See Gall*, 552 U.S. at 41 (reversing Court of Appeals and reinstating a probationary sentence where advisory sentencing range was 30-37 months).

The guidelines here, that recommend a sentence of 41 to 51 months,[7] Dkt. No. 56 at 7, fail to properly account for Mohammed's personal history, and the uniquely harsh punishment he has already endured while confined.  Furthermore, the guidelines at issue here encompass varying degrees of sexual abuse—from for example, repeated contact with a minor victim—to the brief over the clothes contact that the jury found occurred here.

A review of all the sentencing factors, demonstrates that the guidelines as applied to this case, are much harsher that needed to comply with the goals of sentencing.

IV.   *A sentence of 12 months and 1 day is sufficient but not greater than necessary.*

The consequences  Mohammed has already suffered are sufficient to deter him, and to deter others in his position.  Further, through this process Mohammed has been made very aware of the laws of this country.  Mohammed has not previously been accused of any inappropriate contact with a child, and there is no reason to believe that any such conduct will take place in the future.  If there was any concern

---

[7] It is also important to note that because Mohammed exercised his right to trial, the advisory guideline range is from 11 to 21 months greater (if Mohammed had instead entered a plea, with three points for acceptance his total offense level would have been a 19, yielding a guideline range of 30 to 37 months).

that different cultural norms were at issue here, the message has been clearly sent to both Mohammed and other refugees about the bounds of appropriate and inappropriate contact between adults and minors.

Of note, in addition to any sentence this Court imposes, it is likely that Mohammed will be administratively detained by Immigration Customs Enforcement (ICE) after completion of his federal sentence. As noted in the PSR, the conviction in this case violates Mohammed's parolee status. Dkt. No. 56 at 2. However, it is unlikely that, at this point, Mohammed will be sent back to Afghanistan because it is too dangerous to do so.[8] Given the nature of this conviction—a sex offense—it is likely Mohammed will wait in administrative custody while ICE determines where he will go. The high likelihood of extended detention following this Court's sentence is in and of itself grounds for a variant sentence.

If released in the United States, Mohammed will be under the supervision of the U.S. Probation Office and required to register as a sex offender. Being on the registry will, among other things, limit Mohammed's housing and employment options. Both supervision and the registry, are further restrictions on Mohammed's liberty that serve to promote respect for the law, deterrence, and reflect the seriousness of the offense.

---

[8] *See* Montoya-Galvez, Camilo, Biden Administration shields Afghans in the U.S. from deportation, CBS News, March 16, 2022,  available at Biden administration shields Afghans in the U.S from deportation - CBS News (last checked Apr. 19, 2022).

Despite the harsh world Mohammed was raised in, he was always buoyed by the love of his family and motivated by a fierce desire to protect them, in particular, his mother, with whom he is especially close.  Since his detention Mohammed has lost this support, and the ability to provide for his family.  The defense is cognizant that this is a serious case. But it is also a unique case. For all the above stated reasons, the defense submits that a sentence of 12 months and 1 day is more than sufficient to serve the goals of deterrence and punishment, along with the other sentencing factors.

Respectfully Submitted,

/s/ Elizabeth Mullin
Assistant Federal Public Defender

/s/ Lauren E. S. Rosen
Lauren E. S. Rosen
Admitted *Pro Hac Vice*
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800
(703) 600-0880 (fax)
Lauren_Rosen@fd.org